# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

**Cappi S. Thompson**

v.

Case No. 22-cv-00151-PB
Opinion No. 2024 DNH 082

**Zachary J. Howry, et al.**

## MEMORANDUM AND ORDER

Cappi Thompson has sued the City of Berlin, New Hampshire, and several of its police officers for using unconstitutionally excessive force while placing him in protective custody and for violating his right to due process by failing to provide him with medical treatment during his subsequent detention. Thompson also alleges that the defendants violated his rights under the Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973. The defendants have responded with a motion for summary judgment.

For reasons I explain in this Memorandum and Order, I grant the defendants' motion with respect to all of Thompson's claims except his due process medical treatment claims against the individual defendants. With respect to these claims, I require further briefing on the legal standards that govern both the claims themselves and the defendants' qualified immunity defense.

# I.  BACKGROUND

## A.  Events Preceding Thompson's Detention

In the early evening of May 23, 2019, Thompson parked his car on the front lawn of the Berlin Police Department and entered the building on foot. Doc. 15-8 at 1. Once in the station, Thompson, who was "in a state of panic" and bleeding from both his head and nose, approached the mirrored glass dispatch window. Doc. 15-6 at 13. As he attempted to peer through the glass, his hands left blood smears on the glass. Id. He briefly spoke with the police dispatcher and told her that he had been assaulted. Doc. 15-8 at 1.

Thompson left the station about five minutes later without fully reporting what had happened to him and without speaking to an officer. Doc. 15-6 at 13. He told the dispatcher that he was going to the hospital. Doc. 15-8 at 1. Shortly thereafter, the dispatcher called both Androscoggin Valley Hospital ("AVH") and Officer Zachary Howry of the Berlin Police Department to let them know about the encounter with Thompson. Doc. 15-8 at 2.

When the dispatcher reached AVH, the hospital staff informed her that Thompson had already left the hospital without receiving treatment for his injuries. Id. at 2. The hospital relayed that, upon arrival, Thompson had a brief altercation with staff, threw a radio, and left the premises driving recklessly. Id. Howry, who was en route to the hospital, then changed his plan and drove to Thompson's parents' home. Doc. 15-2 at 2.

2

Howry entered Thompson's residence at 7:22 p.m. In the bathroom, he encountered Thompson coming out of the shower. Doc. 15-3 at 00:01. Thompson was still bleeding from injuries on his face and head. Id. He told Howry that he had consumed three beers that day and had been injured during a fight over an allegedly stolen cellphone. Id. at 01:13; 00:30-01:00.

Howry persuaded Thompson to return to the hospital for a medical evaluation and treatment. Id. at 2:15-2:20; Doc. 15-2 at 2-3. Thompson was then transported to the hospital in an ambulance staffed by personnel from Berlin Emergency Medical Services. Howry and Lt. Donald Gendron, who had arrived at the home after Howry, remained behind to speak with Thompson's parents and gather evidence. Doc. 15-2 at 3.

While at the house, Howry learned from Thompson's parents that Thompson was on a conditional discharge from the state hospital. Id. at 2. Thompson, who was 42 years old at the time, had been diagnosed with bipolar and schizo-affective disorders. Id.; Doc. 15-6 at 4. His parents told the officers that Thompson needed to be hospitalized again and that he had made threats against the people who had injured him earlier that day. Doc. 15-2 at 2. In addition, Thompson's parents expressed concerns over his aggression and noted that he might not have been taking his medication. Id. They explained that Thompson's behavior over the last few days had been

3

increasingly erratic and attributed this change to the fact that it was
Thompson's estranged daughter's sixteenth birthday. Doc. 17-5 at 1.

**B.      Thompson is Taken into Protective Custody**

While Thompson was on his way to AVH in an ambulance, Nurse
Karen Ramsey, who was familiar with Thompson, called the police dispatcher
to confirm that officers would be coming to the hospital as well. Doc. 15-8 at
2. When Howry arrived at around 7:50 p.m., Thompson was in the driveway
area walking away from the emergency room ambulance bay. Doc. 17-5 at 1.
Paramedic Robert Doherty was also standing in the driveway, nearer to the
hospital. Id. at 2. Howry approached Thompson and talked to him about
returning to the hospital. Thompson was agitated and yelled profanity. Doc.
15-4 at 00:00-00:10. Howry then told Thompson that he would admit him to
the hospital involuntarily.[1] Id. at 00:01-00:18. Shortly thereafter, Doherty
walked over to where Howry and Thompson were standing and reported that
Thompson had been making threats against the medical staff, including the
ambulance driver. He also told Howry that Thompson had lowered his pants

---

[1]      Under New Hampshire state law, involuntary medical admissions
allow for authorities to admit patients in need of psychiatric treatment
without their consent. The process is outlined in New Hampshire state law,
N.H. Rev. Stat. Ann. § 135-C:27-33.

and defecated in the driveway area in front of the emergency room entrance. Id. at 00:15 to 00:35.

As Howry began to guide Thompson toward the hospital, Howry placed his hand on Thompson's right arm and walked behind him toward the entrance. Id. Then, as Thompson became more agitated and began screaming again, Howry took both of Thompson's hands and held them together behind his back. Id. at 00:35-00:45. While Howry held his hands in place and continued toward the hospital entrance, Thompson repeatedly referred to medical staff, law enforcement, and the town as "evil." He also used derogatory language to describe specific individuals, including AVH Nurse Aaron Stephenson. Id. at 00:45-00:55.

As Howry and Thompson neared the hospital building, Ramsey and Dr. Arthur Ruediger emerged from separate parts of the ambulance bay and approached Thompson and Howry. Id. Thompson continued to shout expletives and slurs at the medical staff, while Howry repeatedly said "easy does it" in a level tone. Id. at 00:40-00:56.

Thompson raised his voice again and struggled against Howry. Thomspon first freed his left arm and began gesturing with it. Id. at 01:01. He then struggled against Howry's hold on him and used his body weight to pull away from Howry entirely. Id. at 01:02. Howry responded by using his leg to bring Thompson forcefully to the ground. Doc. 15-2 at 4. Thompson is 6

feet and 2 inches tall and weighed 240 pounds at the time of the incident. Howry is 5 feet 11 inches tall and weighed 200 pounds. Doc. 15-2 at 2.

As a result of Howry's maneuver, Thompson fell forward onto his left shoulder. Thompson was screaming and struggling as he fell. Doc. 15-4 at 01:02-01:15. Howry and Doherty then rolled Thompson onto his chest. Id. Howry held Thompson's hands in place behind his back. Doherty, pinning Thompson to the ground, placed a knee on Thompson's right arm and pressed it into his back. Id. at 01:15-01:45. As soon as he was on the ground, Thompson continuously yelled and screamed he was hurt. Over Thompson's shouts, Howry and the medical staff discussed how to proceed:

> THOMPSON: Ow. Okay. I'm hurt.
>
> HOWRY: Hold on.
>
> [Other inaudible voices in background]
>
> THOMPSON: You hurt me bad. You broke my ribs—
>
> HOWRY: Listen.
>
> THOMPSON: You broke my ribs. Ow. Ow. I'm hurt. I'm hurt. Get off me. I'm hurt. Please. I'm hurt. I promise I won't. You hurt me.
>
> HOWRY [talking to the medical staff]: We'll—uh—we'll PC him for now.[2]

---

[2] "PC" is a reference to protective custody. N.H. Rev. Stat. Ann. § 172-B:3 authorizes a police officer to place a person in protective custody for up to 24 hours if the officer determines that the person is intoxicated as a result of alcohol consumption.

RUEDIGER[3]: Please.

RAMSEY: Please.

RUEDIGER[4]: And then take him in the morning.

HOWRY: Yeah. Cause he's been drinking here today.

RUEDIGER[5]: No shit.

Id. at 01:13-01:38.[6] None of the medical personnel present at the scene suggested that Thompson should be medically evaluated before being taken to the police station. Id. After indicating that he planned to take Thompson into custody, Howry began to place handcuffs on Thompson as Thompson continuously moaned in pain and as Doherty held him pressed into the ground. Id. at 01:46-02:05.

Once Thompson was in handcuffs, Doherty removed his knee from Thompson's back. Ruediger, Doherty, and Howry discussed the visible

---

[3]     The person speaking is not visible on camera, but it appears to be Ruediger or some other member of hospital staff based on the context.

[4]     See supra text accompanying note 3.

[5]     See supra text accompanying note 3.

[6]     The transcripts in this order are cleaned up to best reflect a good faith record of the exchanges captures on the body worn camera. Inaudible or garbled audio is indicated in brackets. Where relevant, inferences as to the identity of speakers are noted in footnotes.

injuries to Thompson's face and head, including his bloody nose. Howry explained that Thompson was bleeding when Howry first saw him at his parents' house. Id. at 02:05-02:22. Doherty noted that he did not get a proper chance to assess Thompson in the ambulance because of his erratic behavior. Id. at 02:40-02:45. Throughout this exchange, Thompson was moaning and complaining of pain. Id. at 02:05-02:45. Ramsey approached Thompson and tried to calm him down. She bent down to ground level and addressed Thompson by his first name, explaining that he needed to calm down if he wanted to be seen by the medical staff. Id.

> RAMSEY: Alright. Cappi. Cappi. Can you listen to me for one second?
>
> THOMPSON: My rib is broke—I'm hurt.
>
> RAMSEY: Cappi. Cappi. Shut your mouth for one minute and listen to me. If you behave yourself and keep your mouth shut—
>
> THOMPSON: I am, but I'm hurt.
>
> RAMSEY: No. You're not. You're being nasty.
>
> THOMPSON: No, I'm really hurt. My ribs are hurt—
>
> RAMSEY: Cappi.
>
> THOMPSON: —bad from when he threw me down.
>
> RAMSEY: K. Listen to me.
>
> THOMPSON: It doesn't help that I'm cuffed. It's way worse. [inaudible] It hurts bad.

> RAMSEY: Well, Cappi, it's because you're being aggressive to staff. You need to stop. Do you understand me?
>
> THOMPSON: You're evil.
>
> RAMSEY: Okay, well, then you're not coming in until you sober up or something.

Id. at 2:50-03:26.

Howry then assisted Thomspon to his feet. Thompson screamed loudly in pain as he was made to roll over, sit, and then stand. Id. at 03:27-03:55. Howry did not ask the medical staff about evaluating Thompson's injuries any further at this point. Id. Ruediger later stated that had he had reason for concern, he would have spoken up. Doc. 15-11 at 13-14. He noted that Thompson was speaking in complete sentences at the time, did not show signs of respiratory distress, and did not seem in need of immediate medical attention. Id. at 14. Thompson's "agitated state" was the priority and "took precedence over everything else." Id.

Once on his feet, Thompson stopped screaming but continued to say that he was hurt and indicated that he needed to go into the hospital. In response, Howry told him, "You were hurt when you got here, and you didn't go inside." Doc 15-4 at 04:22-04:25. Thompson said, "You hurt me more. You broke my ribs." Id. at 04:25-04:28. When Thompson said he needed medical attention and indicated that he wanted to return to the hospital, Howry responded that he had missed that chance. Doherty said, "No one wants to

help you, [. . .] not at the sake of their safety" (sic). Id. at 04:27-04:32. Howry denied Thompson's requests to return to the hospital and walked him to the police car in handcuffs. Id. at 04:30-05:30. He later informed his supervisors, lieutenants Gendron and William Daisey, of his plan to hold Thompson overnight before returning him to the hospital for medical treatment. Doc. 17-5 at 2.

## C.   Transport to the Police Station

While continuing to insist that he needed medical treatment, Thompson sat in the back seat of Howry's police vehicle but left his feet outside. Doc 15-4 at 06:00-06:30. Thompson responded to Howry's repeated demands to put his feet in the vehicle by claiming that he could not comply with Howry's instruction because his leg didn't bend as a result of a prior injury. Id. During an extended back-and-forth exchange with Howry, Thompson continued to insist that he needed medical treatment. Id. at 06:30-08:00. He also claimed that he had previously broken his leg and that it would not bend. Id. at 08:03-08:58. At one point, Gendron, who arrived on the scene after Thompson was in custody, unsuccessfully attempted to move Thompson's feet into the vehicle. Id. at 09:10-09:15. Eventually, Howry succeeded in putting Thompson's feet into the vehicle and he was able to close the car door. Id. at 09:30-09:50. Howry then drove Thompson to the police station. Id. at 10:05-16:07.

**D.**   **Thompson's Overnight Detention**

Howry arrived at the police station just after 8:00 p.m. and placed Thompson in a holding cell where he photographed Thompson's injuries, including the bruises and scratches on his shoulder, chest, back, and stomach. Doc. 15-5 at 04:15-05:55; Doc. 15-2 at 5. Thompson was able to fully remove his shirt by lifting it over his head to reveal the injuries to his torso. Doc. 15-5 at 05:20-05:45. He continued to complain of pain and broken bones while removing his shirt. Id.

The next morning, at around 7:00 a.m., Thompson was transferred to AVH via ambulance where Ruediger treated him for fractured ribs and dressed his head wound. Doc. 15-11 at 8. The head wound required five staples.[7] The treatment for the broken ribs was pain management. Id. At some point not specified in the record, Howry charged Thompson with one count of disorderly conduct and two counts of criminal mischief. Doc. 17-5 at 2.

**E.**   **Litigation History**

Thompson sued Howry, Gendron, Daisey, and the City of Berlin. He claims that: Howry is directly liable for using excessive force when placing

---

[7]   Ruediger said that typical protocol would be to treat a laceration within twelve to twenty-four hours and that the treatment of Thompson's head wound was consistent with that timeline. Doc. 15-11 at 8.

him in protective custody (Count I), Doc. 1 at 9-11; Howry, Gendron, and Daisey are directly liable for failing to attend to his medical needs during his detention (Count II), id. at 11-12; Howry, Gendron and Daisey are each liable for failing to intervene to protect Thompson from the other defendants' unconstitutional acts (Count III), id. at 12-13; Gendron and Daisey are liable as supervisors for Howry's unconstitutional acts (Count IV), id. at 13-14; the city is liable for the individual defendants' unconstitutional acts on a municipal liability theory (Count V), id. at 14-17;[8] and the city is liable for violating Thompson's rights under the ADA and the Rehabilitation Act (Count VI), id. at 17-19.

The defendants have moved for summary judgment on all claims. Doc. 15.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227

---

[8]    The claims in Counts I through V were all brought pursuant to 42 U.S.C. § 1983. See generally Doc. 1 at 9-17.

(1st Cir. 1996)). A "genuine dispute" exists if a factfinder could resolve the disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). Once the movant has properly presented such evidence, the burden shifts to the nonmovant to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in [his] favor." Irobe, 890 F.3d at 377 (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). If the nonmovant fails to adduce evidence on which a reasonable factfinder could base a favorable verdict, the motion must be granted. Celotex, 477 U.S. at 324. In considering the evidence, the court must draw all reasonable inferences in the nonmoving party's favor. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

### III.  ANALYSIS

Thompson's six claims for relief fit neatly into three categories. Count I and parts of Counts III, IV, and V seek to hold the defendants liable for what Thompson claims was the unconstitutional excessive force used to subdue

him and place him in protective custody. Count II and parts of Counts III, IV, and V allege that the defendants violated Thompson's right to due process by holding him in custody overnight without medical treatment. Finally, he argues in Count VI, that Berlin is liable under the ADA and the Rehabilitation Act because Howry placed Thompson in a police vehicle without accommodating his injured leg. I address defendants' challenges to each category of claims in turn.

A.    **Excessive Force Claims**

Thompson claims in Count I that Howry used unconstitutionally excessive force when he forced Thompson to the ground while attempting to place him in protective custody. He argues in Counts III and IV that Gendron and Daisey are liable for Howry's acts because they failed to intervene to protect Thompson and failed to properly supervise Howry. Thompson also claims in Count V that Berlin is liable for Howry's excessive force under a municipal liability theory. Because I agree with the defendants that Howry did not use excessive force against Thompson, I grant defendants' motion for summary judgment with respect to these claims.

Claims alleging the excessive use of force during a lawful arrest arise from the Fourth Amendment's protection against unreasonable searches and seizures, as incorporated against the states through the Fourteenth

Amendment.[9] Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010). As such,

"[a] claim that law-enforcement officers used excessive force to effect a

seizure is governed by the Fourth Amendment's 'reasonableness' standard."

See McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014) (quoting Plumhoff v.

Rickard, 572 U.S. 765, 774 (2014)).

     In conducting this analysis, I look to whether the force employed was

reasonable given the circumstances. Raiche, 623 F.3d at 36. The

reasonableness standard is a purely objective one that considers what a

reasonable officer would have known at the scene. See id. (noting an officer's

"intent or motivation" should not be considered); see also Graham v. Connor,

490 U.S. 386, 396 (1989) (noting that assessing reasonableness with "20/20

hindsight" is inappropriate). Officers must also be given leeway "to make

split-second judgments—in circumstances that are tense, uncertain, and

rapidly evolving—about the amount of force that is necessary in a particular

situation." Graham, 490 U.S. at 397. "Not every push or shove, even if it may

later seem unnecessary in the peace of a judge's chambers" amounts to a

---

[9]    It is not clear from the record whether Thompson was initially detained and later held overnight in protective custody or whether he was arrested and held on criminal charges. The parties treat Thompson throughout as a pretrial detainee, and I follow their lead without attempting to determine whether different legal standards would apply if criminal charges were not brought against Thompson until after he had been treated for his injuries and released.

Fourth Amendment violation. Dean v. City of Worcester, 924 F.2d 364, 368 (1st Cir. 1991) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)) (internal quotations omitted).

When determining whether an officer's use of force is objectively reasonable, all relevant circumstances must be considered. See Bannon v. Godin, 99 F.4th 63, 78 (1st Cir. 2024) (identifying multiple factors that can affect the analysis). Here, the totality of evidence establishes that the force Howry used against Thompson was not unconstitutionally excessive. First, Howry knew when he forced Thompson to the ground that Thompson had been in a fight earlier in the day, that he was agitated and was not behaving rationally, and that he had threatened to harm medical personnel in his immediate vicinity. Second, Howry knew that he was the only police officer at the scene, and he could see that Thompson was several inches taller and substantially heavier than he himself was. Finally, Howry had to respond instantly to regain control of Thompson to protect the medical personnel in the vicinity whom Thompson had been threatening when he suddenly and violently freed himself from Howry's grasp. Given these circumstances, no

reasonable juror could conclude that Howry's use of force against Thompson was excessive.[10]

Because I conclude that Howry did not use excessive force against Thompson, I also reject Thompson's derivative excessive force claims against Gendron, Daisey, and the city. See Bannon, 99 F.4th at 88 (municipal liability claim requires an underlying control violation); Guadalupe-Báez v. Pesquera, 819 F.3d 509, 514-15 (1st Cir. 2016) (supervisory liability claim must allege an underlying constitutional violation); Harper v. Albert, 400 F.3d 1052, 1064 (7th Cir. 2005) (failure to intervene claim fails where there is no underlying constitutional violation). Accordingly, I grant defendants' motion for summary judgment with respect to Count I in its entirety and Counts III, IV, and V to the extent that they rest on the assumption that Howry used excessive force against Thompson.

## B.   **Medical Care Claims**

Thompson alleges in Count II that Howry, Gendron, and Daisey violated Thompson's right to due process by holding him overnight at the police station without providing him with necessary medical care. He asserts in Count III that all three individual defendants are also liable on a failure to

---

[10]   The parties disagree as to precisely how Thompson used his leg to force Thompson to the ground, but that disagreement does not affect my analysis because I have accepted Thompson's version of what happened for purposes of analysis.

intervene theory, and he claims in Count IV that Gendron and Daisey are liable on a supervisory liability theory. Finally, Thompson claims in Count V that Berlin is liable for the individual defendants' unconstitutional acts on a theory of municipal liability. I address the claims against the individual defendants before turning to Thompson's municipal liability claim.

1.   Individual Defendants

When the government takes a person into custody, it has a constitutional obligation to attend to the person's serious medical needs. If the person is in custody as a result of a criminal conviction, the right to treatment arises from the Eighth Amendment's prohibition of cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 101-02 (1976). A pretrial detainee's right to treatment, in contrast, derives from the Fourteenth Amendment's Due Process Clause. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).

To establish a medical care claim under the Eighth Amendment, a plaintiff "must satisfy both an objective element, which requires proof of a serious medical need, and a subjective element, which requires a showing that a prison official had a sufficiently culpable state of mind such that they were deliberately indifferent to that need." Lech v. von Goeler, 92 F.4th 56, 74 (1st Cir. 2024) (internal quotations omitted). Echoing the United States

Supreme Court in City of Revere, the First Circuit has said that a pretrial detainee's right to treatment under the due process clause extends "at least as far as the protection that the Eighth Amendment gives to a convicted prisoner." Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 74 (1st Cir. 2016). This framing suggests that the Due Process Clause might offer greater protection to pretrial detainees in some circumstances. In practice, however, the First Circuit has consistently applied the Eighth Amendment test to medical care claims by pretrial detainees without further elaboration. See, e.g., Zingg v. Groblewski, 907 F.3d 630, 634-35 (1st Cir. 2018); Ramos v. Patnaude, 640 F.3d 485, 489 (1st Cir. 2011); Ruiz-Rosa v. Rullán, 485 F.3d 150, 155 (1st Cir. 2007) ("Generally, the standard applied under the Fourteenth Amendment is the same as the Eighth Amendment standard.").

Other circuits that have addressed the legal standard for medical treatment claims by pretrial detainees have split over whether the Supreme Court's decision in Kingsley v. Hendrickson, 576 U.S. 389, 395 (2015), entitles pretrial detainees to greater protection than the Eighth Amendment provides to post-conviction inmates.[11] In particular, the Second, Seventh, and

---

[11]    Kingsley is an excessive force case in which the court determined that a pretrial detainee can establish an excessive force claim by proving that the force used was objectively unreasonable without also undertaking a subjective inquiry into a defendant's state of mind. 576 U.S. at 396.

Ninth Circuits have held that the Fourteenth Amendment protects pretrial detainees from objective "deliberate indifference" to their need for medical care. See Miranda v. Cnty. of Lake, 900 F.3d 335, 352 (7th Cir. 2018); Darnell v. Pineiro, 849 F.3d 17, 34-35 (2d Cir. 2017); Castro v. Cnty. of Los Angeles, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc). Under this purely objective standard, a constitutional violation can be found when an official "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official[ . . .] should have known[] that the condition posed an excessive risk to health or safety." Darnell, 849 F.3d at 35.

Declining the Kingsley invitation, though, the Fifth, Eighth, and Eleventh Circuits have held that the subjective "deliberate indifference" test should apply for both pretrial and post-conviction inmates. Whitney v. City of St. Louis, 887 F.3d 857, 860 n.4 (8th Cir. 2018); Dang ex rel. Dang v. Sheriff, Seminole Cty., 871 F.3d 1272, 1279 n.2 (11th Cir. 2017); Alderson v. Concordia Par. Corr. Facility, 848 F.3d 415, 420 (5th Cir. 2017). In other words, these circuits have held that proving a claim for failure to provide adequate medical attention for a pretrial detainee requires a showing both of an objectively serious medical need and of a subjective deliberate indifference to that need.

The First Circuit has not addressed the post-Kingsley circuit split as to whether a due process medical treatment claim can be established without proof of subjective deliberate indifference. Nor have the parties presented developed arguments on this important legal question. And, even if I were to be persuaded that a medical treatment claim by a pretrial detainee does not require proof of subjective deliberate indifference, I would need to determine whether the individual defendants were nevertheless entitled to qualified immunity on such claims. Because the First Circuit has never held that a due process medical treatment claim can be established without proof of subjective deliberate indifference, a question arises as to whether the law on this point was clearly established when the defendants failed to treat Thompson.

In Sandoval v. County of San Diego, 985 F.3d 657 (9th Cir. 2021), the majority held that "because the clearly established law prong [of the qualified immunity analysis] focuses objectively on whether it would be clear that the defendant's conduct violated the constitution, lack of notice regarding the mental state required to establish liability has no bearing on the [qualified immunity] analysis." Id. at 675. In contrast, the partial dissent in Sandoval concluded that a court was not free to ignore a change in the law as to whether subjective deliberate indifference was required to prove a due process medical treatment claim when conducting a qualified immunity

analysis. Id. at 685-86. Because this difficult issue was also not briefed by the parties, I am unable to determine on the present record whether any of the individual defendants are entitled to summary judgment on Thompson's medical treatment claims. Accordingly, I deny the defendants' motion for summary judgment with respect to these claims.

2.   Municipal Liability Claim

To establish municipal liability in an action brought under 42 U.S.C. § 1983, the plaintiff must show both that there was a constitutional violation and that the violation resulted from the implementation of "official municipal policy." Lozman v. City of Riviera Beach, Fla., 585 U.S. 87, 95 (2018); see also Wilson v. Town of Mendon, 294 F.3d 1, 7 (1st Cir. 2002). Municipal liability exists only if, "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 400 (1997) (citing Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978)).

To prove municipal liability, a plaintiff must show that "(1) a municipal policymaker intentionally adopted a policy, implemented a training protocol or allowed a custom to develop; (2) the challenged policy, training protocol or custom caused a violation of federally protected rights; and (3) the policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the

22

implementation of the policy, training, protocol or custom." Penney v. Town of Middleton, 888 F. Supp. 332, 340 (D.N.H. 1994) (citing Canton v. Harris, 489 U.S. 378, 385 (1989)). A municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact. Connick v. Thompson, 563 U.S. 51, 61 (2011).

Here, I must look at whether any city policy, custom, or training failure led to the defendants' deliberate indifference to a serious medical need. Plaintiff has not pointed to any individual city policy that led to a failure to provide Thompson with adequate medical care.[12] Doc. 17 at 8-9. Nor does he allege a failure to properly train officers about how to handle a situation such as Thompson's. Id. If anything, the plaintiff's deposition of the city, appended as an exhibit to the Objection, suggests that there was a policy in place that required that officers provide medical care to detainees who request it. Doc. 17-4 at 12-13.

Because there is no genuine dispute as to any material fact regarding the city policies, and no reasonable factfinder could conclude that anything in

---

[12]    The plaintiff's brief does point to failures in city policy surrounding accommodation of physical disability. Doc. 17 at 8-9. However, the city's alleged failure to adequately accommodate Thompson's limited range of motion in his leg does not give rise to any of his constitutional claims.

the city policies, customs, or training practices gave rise to the claimed violations of Thompson's right to adequate medical care, I grant the defendants' motion for summary judgment with respect to Thompson's municipal liability claim in Count V.

**C.**      **ADA and Rehabilitation Act**

The ADA and the Rehabilitation Act both provide for a private right of action to sue local governments for failure to provide reasonable accommodation to a person with a legally cognizable disability. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

To prevail on a Title II claim based on a failure to accommodate, a plaintiff must demonstrate "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." Buchanan v. Maine, 469 F.3d 158, 170-71 (1st Cir. 2006) (quoting Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000)).

The Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability [. . .] shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Given the similarities between the statutory language, claims under the ADA and Rehabilitation Act have been analyzed in the same manner. Nunes v. Mass. Dep't, of Corr., 766 F.3d 136, 144 (1st Cir. 2014). I thus resolve both Thompson's ADA and Rehabilitation Act claims by determining whether he has a viable ADA claim.

How federal disability law applies to ad hoc police encounters is not a totally settled area of law in this circuit. See Gray v. Cummings, 917 F.3d 1, 16-17 (1st Cir. 2019). Thompson sued based on the theory that the city may be liable for the officers' failures to accommodate his disability, thereby "causing [him] to suffer greater injury or indignity in that process than other arrestee." Id. at 15 (quoting Gohier v. Enright, 186 F.3d 1216, 1220-21 (10th Cir. 1999)) (internal quotations omitted). The First Circuit has not yet concluded that Title II accommodation law applies to ad hoc police encounters or that, if it does, a city could be held vicariously responsible for the actions of officers. Id. at 16-17. However, even assuming without deciding that it does, Thompson cannot recover under the ADA because no reasonable factfinder

could conclude that Thompson has a cognizable accommodation claim based on the factual record.

Thompson claims that Howry and Gendron failed to reasonably accommodate his disability during transport to the police station following the arrest. Doc. 17 at 9. He alleges that the officers failed to reasonably accommodate his inability to use his leg when getting him into the back of the police SUV. Id. To prove this claim, Thompson must show that Howry and Gendron knew his "ADA-protected right was likely to be abridged [and] neglected to take available preventative action notwithstanding such knowledge." Gray, 917 F.3d at 18.

For a reasonable factfinder to hold for the plaintiff, they must be able to conclude that Howry and Gendron knew of the disability and that it required them to act differently. No reasonable factfinder could do so here. Thompson was well able to get in and out of the car. If any reasonable accommodation was necessary, it was only that he needed someone to help lift his foot while his hands were secured behind his back. Though it took time for Howry and Gendron to ultimately comply and assist Thompson, they did ultimately do so. Doc 15-4 at 09:30-09:50. Thompson was able to travel to the police station in the usual way. Id. Given that the police department did ultimately adjust their behavior to accommodate Thompson's needs, there is no viable accommodation claim here and no need to decide whether the ADA and

26

associated federal disability law apply to ad hoc police encounters or creates municipal vicarious liability. <u>See</u> Gray, 917 F.3d at 17.

## IV.   <u>CONCLUSION</u>

For the reasons explained above, I grant defendants' motion for summary judgment as to Count I, the parts of Counts III, IV and V that allege liability for excessive force, and Count VI. I otherwise deny the defendants' motion for summary judgment without prejudice.

SO ORDERED.

<u>/s/ Paul J. Barbadoro</u>
Paul J. Barbadoro
United States District Judge

September 30, 2024

cc:     Counsel of Record